### QUALITY TECHNOLOGY COMPANY, Plaintiff,

v.

### STONE & WEBSTER ENGINEERING COMPANY, INC., Stemar Corporation, Beta, Inc., and Steven A. White, Defendants.

### No. CIV–1–87–054.

United States District Court, E.D. Tennessee, S.D.

March 27, 1989.

Opinion on Motion to Alter or Amend June 1, 1990.

**1334**

Harry L. Dadds and W. Ferber Tracy, Spears, Moore, Rebman & Williams, Chattanooga, Tenn., and Donna Keene Holt, Gilreath & Associates, Knoxville, Tenn., for plaintiff.

Edward S. Christenbury, Gen. Counsel, James E. Fox, Deputy Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Robert C. Glinski, Asst. Gen. Counsel, Brent R. Marquand, Thomas C. Doolan, Helen de Haven, Tennessee Valley Authority, Knoxville, Tenn., for defendants.

## MEMORANDUM

EDGAR, District Judge.

The defendants in this civil action have filed a motion to dismiss the plaintiff's complaint, or in the alternative, for summary judgment as to those claims therein. (Court File No. 31). In support of their motion, defendants have filed the affidavits of two present, and one former, TVA Office of Nuclear Power employees, as well as that of a TVA attorney. (Court File Nos. 32–35). The plaintiffs have responded in opposition to the defendants' motion (Court File No. 86), filing supporting affidavits and deposition exhibits. (Court File Nos. 89–93). This case was originally filed in the Circuit Court of Hamilton County, Tennessee and removed by the diverse defendants pursuant to 28 U.S.C. § 1441 upon their representations that the plaintiff's complaint alleges claims governed by federal law, and that the parties are diverse. 28 U.S.C. §§ 1331 and 1332. *See* Court File No. 2.

### Factual Background

In 1985, the Tennessee Valley Authority (hereinafter "TVA") hired the plaintiff, Quality Technology Company (hereinafter "QTC"), to perform various contract services specifically related to interviewing TVA employees of the Watts Bar Nuclear Plant pursuant to an employee concern program established by TVA. This program was created in response to the many complaints the Nuclear Regulatory Commission ("NRC") received from TVA/Watts Bar employees regarding safety violations alleged to have occurred during construction of that nuclear facility. The contract between TVA and QTC, Contract No. TV–66317A (Exhibit 30, Court File No. 92) was entitled "Tennessee Valley Authority Contract for Personal Services," and provided that the contractor, QTC, would perform certain services for TVA "[w]hen and as requested by the Director of TVA's Nuclear Safety Review Staff (NSRS)...." The term of the contract was for one year, beginning on April 26, 1985. As indicated from the contract, those services included generally: conducting interviews of present and former TVA employees at Watts Bar, developing and implementing procedures for gathering and processing employee interviews confidentially, certain investigatory work necessitated by employed interviews and complaints, and reporting those results to the TVA while maintaining employee confidentiality.

As the TVA/QTC contract and working relationship progressed, QTC made its reports and answered to the TVA Nuclear Safety Review Staff, which in turn reported directly to the TVA Board of Directors. With regard to certain complaints of intimidation and harassment, QTC reported to the TVA Office of the General Counsel.

As the employee concerns program developed, the volume of complaints and issues raised in the interviews drastically increased. As a result of the unexpected number of issues and complaints received, TVA and QTC modified the personal services contract to include additional funds and time for the performance of more investigatory services by QTC, necessitated by those complaints. *See* Exhibits 31–33.

In late 1985, TVA began to consider the alternative of creating its own internal program for identifying and addressing nuclear employee concerns. In an effort to establish its own program, TVA and QTC entered into a second contract for the services of QTC. This contract, No. TV–68705A, was separate and distinct from the original one-year contract to respond to employee complaints, and provided that QTC was to aid TVA in the development of its own in-house system for dealing with employee safety concerns. During this same period, TVA began to contemplate the need to modify the investigatory functions being performed by QTC under the original contract. In an effort to facilitate the investigation and resolution of the large number of employee safety concerns, the TVA General Manager proposed a change in the structure of the review program to create a "management review group." It was the purpose of this change to coordinate all pending investigations of safety-related concerns and complete their review within a six-month period. It is QTC's position that it was to be heavily involved in this new program, being assigned new responsibilities for investigating pending employee concerns pursuant to an agreement with TVA's general manager. QTC was asked by TVA's general manager to submit a contract modification proposal incorporating QTC's additional responsibilities, and did so in December of 1985.

It was during the following months of January and February of 1986 that defendant Steven White assumed his duties as Manager of TVA's Office of Nuclear Power pursuant to a contract between TVA and defendants Stone & Webster Engineering Co. and Stemar Corp. *See* Exhibits 49–55, Court File No. 92. White assumed the job of operating TVA's nuclear power program as a "loaned employee" (Exhibit 49), with his responsibilities and authority defined by the "Memorandum of Understanding" between the TVA Board of Directors and White. *See* Attachment to Exhibit 49, Court File No. 92. It is clear from this document that TVA clothed Steven White with very broad and "direct authority for the management, control and supervision of TVA's entire nuclear power program...." *Id.* at ¶ 2. As a result of White assuming control of TVA's nuclear power program, QTC asserts that drastic changes in the scope of QTC's responsibility under the original contract occurred. It is QTC's treatment by the Manager of the Office of Nuclear Power and those working directly for him pursuant to contract that gives rise to QTC's claims.

### QTC's Claims

In its complaint, QTC alleges four causes of action against these individual and corporate defendants. QTC asserts state law causes of action based on the defendants' alleged inducement of TVA to breach its contract with QTC for continued personal services under contract No. TV–66317A. *See* T.C.A. § 47–50–109. QTC further alleges that the defendants tortiously interfered with QTC's business relationship with the TVA. QTC's third cause of action alleges that the defendants engaged in trade disparagement, an injury alleged to have resulted from certain remarks defendants White and a representative of Beta, Inc. made regarding QTC's job performance and White's dissatisfaction therewith. This is a claim of defamation under Tennessee law. Lastly, QTC asserts as its fourth cause of action that the defendants' alteration or termination of the TVA/QTC personal services contract resulted in a violation of QTC's Fifth Amendment rights under the Constitution to due process, where the defendants' actions denied QTC a property right in the performance of the contract in bad faith.

Plaintiff also seeks to amend its complaint to add a claim for deprivation of

"liberty" interests under the Fifth Amendment. *See* Court File No. 84. The Court has not yet acted on this motion.

### Defendants' Motion for Summary Judgment

Defendants' motion seeking dismissal of QTC's case, or in the alternative, summary judgment, will be treated as a motion for summary judgment pursuant to Fed.R. Civ.P. 56(c) due to the parties' and the Court's reliance upon affidavits and documents outside the pleadings. 10 C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure* § 2713 (1983).

QTC asserts that the defendants failed to timely raise their affirmative defense of official and qualified immunity under Fed. R.Civ.P. 8(c). Professor Wright has stated the general rule that "a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case." 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1278 (1969). However, he goes on to note that some federal courts limit this waiver provision to only those affirmative defenses noted in Rule 12(h). *Id.* In this circuit, it has been held "that immunity, whether qualified or absolute, is an affirmative defense which must be affirmatively pleaded; ... [the] failure to do so *can* work a waiver of the defense." *Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir.1986) (emphasis added). However, "[w]here the matter is raised in the trial court in a manner that does not result in unfair surprise, ... [the] technical failure to comply precisely with Rule 8(c) is not fatal." *Allied Chemical Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir.1983), *quoted in Lucas v. United States*, 807 F.2d 414, 417 (5th Cir.1986). As noted in *Lucas*, "the defendant does not waive an affirmative defense if 'he raised the issue at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond.'" 807 F.2d at 418, *quoting Mackay*, 695 F.2d at 856.

As noted by other courts, "liberal pleading rules are equally applicable to the pleading of affirmative defenses." *Baker v. City of Detroit*, 483 F.Supp. 919, 921

(E.D.Mich.1979). The key to this analysis is apparently whether, absent asserting immunity as an "affirmative defense" in the pleadings, the parties otherwise had notice of the issue. As Professor Wright notes, "[a]nother highly relevant consideration is whether plaintiff will be taken by surprise by the assertion at trial of a defense not pleaded affirmatively by defendant." C. Wright and A. Miller, *Federal Practice and Procedure* § 1271 at 315. In this case, the defendants raised in their answer (Court File No. 3) the issue of privilege, designated as defenses. In several of these defenses defendants assert that their activity and involvement with TVA's federal nuclear power program entitle them to the defense of privilege from liability, making the plaintiff's claims non-actionable. Defendants filed their answer on March 3, 1987. After several months of discovery, the defendants filed their motion for summary judgment (Court File No. 31) asserting official and qualified immunity on January 19, 1988.

■ QTC has alleged no facts to support the assertion that it has been prejudiced by the defendants' failure to raise as an affirmative defense the issue of immunity. There will be no element of unfair surprise visited on the plaintiff at trial since the issue was raised at a relatively early stage of these proceedings. The Court can assume that some discovery was necessary in order for the defendants to be in a position to factually and legally appreciate the claims made against them in the complaint. The Court does not find that the timing of the defendants' motion has resulted in any prejudice to QTC or its ability to fully respond to the defense of immunity. For these reasons, the Court does not find that the defendants waived their right to assert official or qualified immunity.

The defendants' motion seeks summary judgment on several grounds. With regard to plaintiff's state law claims for trade disparagement, defendants assert that the applicable six-month Tennessee statute of limitations, T.C.A. § 28–3–103, bars plaintiff's claim for commercial def-

amation.[1] As for the remaining state law claims for interference with contract and inducement to breach, defendants claim that absolute official immunity shields them from suit. *See Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959); and more recently, *Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). Defendants also assert that principles of qualified official immunity bar plaintiff's claim based on deprivation of its liberty and property interests protected by the Fifth Amendment to the United States Constitution. *See Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Defendants further challenge the merits of plaintiff's claim based on deprivation of Fifth Amendment due process on the ground that plaintiffs have no recognized liberty and/or property interest in the subject contract.[2]

Because the Court finds the applicability of absolute official immunity and qualified immunity is, if legally available to the defendants, dispositive of the issues raised by the defendants' summary judgment motion, the Court will address the immunity question first.

QTC's complaint alleges three state law causes of action under Tennessee common law and statutes, together with a fourth federal constitutional claim grounded in

Fifth Amendment due process protections. Defendants assert that they are immune from suit on the state law claims because they are entitled to absolute official immunity under the principles announced by the Supreme Court in *Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and *Howard v. Lyons*, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959). QTC responds in opposition to defendants' claim of absolute immunity by pointing out that such federal official immunity does not apply to defendant Steven White because he is not a federal employee of the kind entitled to immunity from suit. QTC points to the specialized nature of the contractual relationship between TVA and its contractor, defendant Stone & Webster, which in turn contracted with Stemar Corp. for the services of White. As QTC points out, the arrangements between these contracting parties to secure White's services as TVA's Manager of Nuclear Power reveal an intent to side-step regular hiring practices and the related federal statutory and regulatory limitations on salary and compensation. QTC relies heavily on distinguishing White's employment status with TVA as a "loaned employee" in its assertion that he is not the type of federal employee or independent contractor entitled to the benefit of official immunity. The Court believes QTC's focus on Steven White's employment "status" in determining his entitlement to immunity from suit is misplaced.

1. T.C.A. § 28-3-103 provides: "Actions for slanderous words spoken shall be commenced within six (6) months after the words are uttered." This statute "sets forth a positive and distinct event that triggers the running of the limitations period—the utterance of the alleged defamatory words." *Heller v. Smither*, 437 F.Supp. 1, 5 (M.D.Tenn.1977). Plaintiff filed the instant suit on January 16, 1987, originally in Hamilton County Circuit Court. It was subsequently removed to this Court on February 23, 1987. QTC argues for the application of section 568, comment (f) of the *Restatement (Second) of Torts* which provides that defamatory words spoken to a newspaper reporter and later published constitutes libel. QTC argues therefrom that the one-year statute of limitations provided for libel actions (T.C.A. § 28-3-104(a)) should apply to its claim of trade disparagement. The Court is reluctant to apply this rationale in this case

where the plaintiff's claim arises under Tennessee law, absent clear authority in the Tennessee courts for such a construction. Pursuant to T.C.A. § 28-3-103 and *Heller*, application of the six months limitations period would appear to bar QTC's claim of trade disparagement—slander.

2. Initially, plaintiff's constitutional claim asserted as plaintiff's "fourth cause of action," ¶¶ 48, 49 and 50 of the complaint, asserted only deprivation of a protected property interest as a result of the alleged contract breach. However, plaintiff has pending a motion to amend its complaint to add a claim for deprivation of a protected liberty interest as a result of the same nucleus of events (Court File No. 84). Defendants oppose this attempt to amend plaintiff's complaint (Court File No. 101).

In *Barr v. Matteo,* the Court was faced with the issue of whether a federal executive branch official could be held civilly liable under the libel laws of the District of Columbia for allegedly defamatory statements contained in a press release regarding the reason for the suspension of other officers of his agency. The issue as framed by the Court, that also describes the rationale for the official privilege, is the balance between the individual's right to protection from pecuniary damages caused by the actions of government officials and "the protection of the public interest by shielding responsible governmental officers against the harassment and inevitable hazards of vindictive or ill-founded damage suits brought on account of action taken in the exercise of their official responsibilities." 360 U.S. at 565, 79 S.Ct. at 1336, 3 L.Ed.2d at 1438.

The purpose of this grant of official immunity is plainly described in *Barr:*

> It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

360 U.S. at 571, 79 S.Ct. at 1339, 3 L.Ed.2d at 1441. *See also Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2910, 57 L.Ed.2d 895 (1978).

■ However, the privilege or immunity against civil suits afforded government officials is not unlimited in its scope, where its application in the federal courts requires that the act complained of "must have been within the scope of [the official's] powers; ...." *Barr,* 360 U.S. at 572, 79 S.Ct. at 1340, 3 L.Ed.2d at 1441. Nor is the reach of immunity protection limited by position or status. Specifically, the *Barr* Court held that principles of immunity extend beyond "executive officers of cabinet rank," noting "[t]he privilege is not a badge or emolument of exalted office, but an expres-

sion of a policy designed to aid in the effective functioning of government." *Id.* at 572–73, 79 S.Ct. at 1340–41, 3 L.Ed.2d at 1442. It is not the status or level of an official within the hierarchy of government that is determinative. It is, instead, the scope of that official's duties which defines the bounds of his protection. So long as the act complained of is within those bounds, *i.e.,* "within the outer perimeter" of the official's duties, the official is entitled to immunity. *Barr* at 575, 79 S.Ct. at 1341, 3 L.Ed.2d at 1443.

Very recently in *Westfall v. Erwin,* the Supreme Court refined the standards applicable to absolute official immunity, making the official's exercise of discretion a necessary element. 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). The rule stated in *Westfall* is that "absolute immunity from state-law tort actions should be available only when the conduct of federal officials is within the scope of their official duties and the conduct is discretionary in nature." *Westfall* clarified the "discretionary" requirement previously assumed to be an element in *Barr* by many courts, on the theory that it inherently arose from an officials' status. *See Westfall,* 484 U.S. at 298, n. 4, 108 S.Ct. at 584, n. 4, 98 L.Ed.2d at 626, n. 4. *Westfall* also reinforces the *Barr* Court's holding that it is not the public official's status that is determinative of his entitlement to immunity, but rather the focus is a "functional inquiry" whereby "immunity attaches to particular official functions, not to particular offices." *Westfall,* at 296, n. 3, 108 S.Ct. at 583, n. 3, 98 L.Ed.2d at 625, n. 3 (citations omitted). As the footnote explains:

> The adoption of this functional approach reflects the Court's concern expressed in *Doe [Doe v. McMillan,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973)], that federal officials be granted absolute immunity only insofar as the benefits of immunity outweigh the costs. Because the benefits of official immunity lie principally in avoiding disruption of governmental functions, the inquiry into whether absolute immunity is warranted in a particular context depends on the degree to which the official function would suf-

fer under the threat of prospective litigation.

*Id.* There is additional authority for this proposition in other Supreme Court decisions applying absolute and qualified immunity. *See Cleavinger v. Saxner,* 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507, 514 (1985); *Briscoe v. LaHue,* 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982); *Butz v. Economou,* 438 U.S. 478, 511, 98 S.Ct. 2894, 2913, 57 L.Ed.2d 895 (1978); *Mitchell v. Forsyth,* 472 U.S. 511, 521, 105 S.Ct. 2806, 2812, 86 L.Ed.2d 411, 422 (1985); *Forrester v. White,* 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555, 563 (1988); *Spalding v. Vilas,* 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896).

■■ QTC's argument that White's employment status is determinative of his entitlement to immunity ignores the Supreme Court's determination that a functional inquiry is in fact the proper analysis. Likewise, QTC's reliance upon Tennessee immunity cases in support of its argument that White is not entitled to immunity is misplaced, where it is clear that "the scope of absolute official immunity afforded federal employees is a matter of federal law, 'to be formulated by the courts in the absence of legislative action by Congress.'" *Westfall,* 484 U.S. at 296, 108 S.Ct. at 583, 98 L.Ed.2d at 625, *quoting Howard v. Lyons,* 360 U.S. at 597, 79 S.Ct. at 1333.

■ The issue raised by the defendants' claim of absolute official immunity is whether, when applying the "functional inquiry" to these defendants, they performed the type of federal government function contemplated by the applicable Supreme Court precedent. The Court finds they did. The Tennessee Valley Authority was created by an Act of Congress in 1933. *See* 16 U.S.C. §§ 831 *et seq.* It's primary purpose at the time of its creation was the promotion of navigation on the southeastern waterways within its jurisdiction, and con-

trolling floods. *See Grant v. Tennessee Valley Authority,* 49 F.Supp. 564 (D.C. Tenn.1942). The TVA was also vested with the authority to create facilities for the generation of electric power, originally invisioned as a natural outgrowth of the construction of dams and reservoirs necessary to facilitate flood control and waterway navigation. *See* 16 U.S.C. § 831h–1. As has been declared by many courts, the TVA is a federal government corporation—"an agency performing wholly governmental services, and is an instrumentality of the United States." *PRI Pipe Supports v. TVA,* 494 F.Supp. 974, 975 (N.D.Miss.1980) (citations omitted); *see also TVA v. Kinzer,* 142 F.2d 833 (6th Cir.1944). It is clear that TVA performs a governmental function of the type contemplated by the judicially-created official immunity doctrine.

■ With regard to Steven White and the other defendants hired by TVA to manage its nuclear power program, the "functional inquiry" described in *Westfall* requires consideration of the functions these defendants performed for the TVA. The relationship between the TVA and the defendant Steven White is defined by the January 3, 1986 "Memorandum of Understanding" made a part of the record in this case.[3] *See* Collective Exhibit 1 to Affidavit of Glinski, Court File No. 26; also contained as Exhibit 49, Court File No. 92. That memorandum of understanding contains the following provisions, relevant to this inquiry:

1. Steven White and "certain other personnel" are loaned employees pursuant to TVA contracts with defendant Stone & Webster, and White is the "Manager of Nuclear Power."

2. The Manager of Nuclear Power will have direct authority and responsibility for the management, control and supervision of TVA's entire nuclear power program, including but not limited to, the design, construction, maintenance and operation of all existing or planned TVA

**3.** Unless otherwise noted, all contract documents cited as defining the relevant agreements between the parties appear to have been duly executed and authentic. The Court as-

sumes the exhibit documents are correct copies of the parties' valid and duly executed agreements.

**1340**

nuclear power plants. The Manager of Nuclear Power shall have the authority to establish management and operating policies and procedures related to TVA's nuclear power program. The Manager of Nuclear Power shall also have the authority to hire, remove, assign, reassign, or direct any personnel supplied by outside contractors, and subject to the approval of the Board of Directors with respect to senior level TVA managers in accordance with existing reservation of authorities by the TVA Board, any TVA personnel engaged in nuclear power program activities as he may deem necessary or desirable to implement such policies or procedures.... [T]he manager of Nuclear Power shall be responsible for all personnel, planning, scheduling, regulatory, licensing, engineering, construction, operational, quality assurance, training, maintenance, and other technical or administrative matters relating to the TVA nuclear power program and shall have the authority to review and approve, and subject to the approval of the General Manager and the Board of Directors, redirect and/or restructure the activities and functions of any existing TVA office in these areas insofar as they pertain to the nuclear power program. The manager of Nuclear Power shall be TVA's principal spokesman on public information matters.... The Manager of Nuclear Power shall be the primary line manager with responsibility to determine the need for, requisition, technically evaluate, and receive all materials and services required for the nuclear power program.... The Manager of Nuclear Power is authorized and directed to cooperate fully with the United States Nuclear Regulatory Commission and any other agency or entity, governmental or otherwise, with jurisdiction over or interest in TVA's nuclear power program to assure the safe, reliable and efficient design, construction, operation, and maintenance of TVA's nuclear facilities, and shall be responsible for all aspects of TVA's relations with such agencies and entities.

3. The Manager of Nuclear Power shall have direct access to the TVA Board of Directors and shall report directly to the General Manager and the Board of Directors.... With the exception of the Inspector General and General Counsel functions, all internal TVA activities or functions and/or outside contractors currently reporting to the TVA Board with respect to the TVA nuclear power program shall report to the Manager of Nuclear Power.... The Manager of Nuclear Power shall be authorized to contract for such personnel services as he shall deem necessary to support the TVA nuclear power program or the functions of the Office of Nuclear Power. In addition to the specific powers described herein, the Manager of Nuclear Power is authorized to undertake or have the appropriate TVA office or outside contractor(s) undertake, such studies, activities, or programs he deems necessary to improve the safety, reliability, or efficiency of TVA nuclear facilities and to take any other actions that he deems necessary or appropriate to improve the effectiveness of the overall management of TVA's nuclear power program and carry out the purposes of the Memorandum of Understanding.

. . . .

5. As Manager of Nuclear Power, Mr. White will be subject to all applicable TVA rules and procedures covering TVA employees, including specifically the regulations and other requirements on employee conduct, conflicts, and ethics....

Also relevant to this inquiry are the contract supplements and revisions subsequently negotiated between Stone & Webster and TVA respecting arrangements for "loaned employees." Specifically, Supplement 2 to contract No. TV–68879A (Exhibit 51, Court File No. 92) contains modifications of the parties agreement, including the following relevant amendments:

Appendix 1—Guidelines For Senior Manager (STEMAR)

. . . .

2. The Manager of ONP [Office of Nuclear Power] may make decisions on the

need for additional services or equipment of any type. He may also identify companies deemed qualified to supply such services or equipment, . . . .

In addition to the above-cited documents which define the scope of authority of the TVA Manager of Nuclear Power, the defendants have filed the affidavit of William F. Willis, General Manager of TVA (Court File No. 35), whose duties include direct involvement with the matters relevant to this case, and who has personal knowledge of the facts here relevant. In his affidavit, Willis defines the authority given the Manager of Nuclear Power by the TVA Board, as follows:

> 3. The TVA Board of Directors determined that, in order to ensure that such safety concerns would be properly addressed and the units put into operation, a Manager of TVA's Office of Nuclear Power (ONP) was needed with direct authority and responsibility for the total management, control, and supervision of TVA's entire nuclear power program. The TVA Board sought a highly qualified and nationally respected manager in the nuclear field and on January 3, 1987, the TVA Board selected retired Admiral Steven A. White for this position.

> . . . .

> 5. The Board delegated to Mr. White, who assumed his duties on January 13, 1986, broad and far-reaching authority. Mr. White is responsible for the daily management of the nuclear power program and looks to me as the TVA General Manager and to the TVA Board for oversight, direction, and support.

Affidavit of Willis, Court File No. 35.

As recently stated by the Supreme Court, in applying the requisite analysis contemplated by the "functional" approach to immunity questions, courts are to:

> examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and . . . seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. Officials who seek exemption from personal liability have the burden of showing that such an exemption is justified by overriding considerations of public policy, and the Court has recognized a category of "qualified" immunity that avoids unnecessarily extending the scope of the traditional concept of absolute immunity.

*Forrester v. White*, 484 U.S. 219, 224, 108 S.Ct. 538, 542, 98 L.Ed.2d 555, 563 (1988) (citations omitted). It is this framework under which this Court must assess the defendants' claim of absolute official immunity.

As the provisions cited from the Memorandum of Understanding between TVA and Stone & Webster regarding White's duties as Manager of Nuclear Power indicate, taken together with the affidavit of TVA General Manager Willis, as TVA Manager of Nuclear Power, Steven White was given responsibility for the operation of TVA's entire nuclear program, answering only to the General Manager and the Board of Directors. His authority included supervision of the daily operation of the nuclear power program, as well as any employees and contractors involved in all phases of TVA nuclear power, including QTC. His duties encompassed authority over TVA nuclear power personnel and contracts for work to be performed for TVA at the various plants. The broad grant of authority given White is evidenced by the parties' use of both specific grants of authority and general terms indicating that many management decisions were discretionary. Clearly, White was authorized to take most any action deemed "necessary or appropriate" by him to accomplish his task of restoring the TVA nuclear power program to operation. *See* ¶¶ 2, 3 of Exhibit 49, Memorandum of Understanding, Court File No. 92. It is clear that the job for which QTC was hired and which it substantially performed (contract No. TV–66317A) fell within the parameters of the management duties for which White was hired. At the relevant time, identifying and addressing the safety concerns expressed by TVA employees was a high priority task, crucial to returning the TVA nuclear program to operating status. *See* Willis Affidavit at ¶¶ 2, 3; White Affidavit at ¶¶ 2–5, Court File No.

34; Mason Affidavit at ¶¶ 2–3; Plaintiff's Brief in Response to Motion for Summary Judgment, Court File No. 87, at 1.

The Court finds, based on the terms of the documents above-cited and the affidavits filed by the defendants that QTC's contractual relationship with TVA was "within the scope of [the defendant White's] official duties." *See Westfall*, 484 U.S. at 296, 108 S.Ct. at 583, 98 L.Ed.2d at 625. QTC has offered no evidence to rebut this conclusion. It is, therefore, clear that the first prong of the absolute immunity test set out in *Westfall* is satisfied. *Id.*

### Second–Prong Analysis

The second prong of the *Westfall* test, that the challenged official actions be discretionary in nature remains to be considered. Plaintiff QTC was a contractor hired by TVA to conduct interviews and compile information relevant to TVA nuclear power employee safety complaints. The terms of its contract call for it to perform "personal services" on a "when and as requested" basis for TVA. *See* Exhibit 30, Court File No. 92. The contract was expanded and extended on more than one occasion. *See* Exhibits 31–33, Court File No. 92. Steven White, as Manager of Nuclear Power, had the direct authority and responsibility to manage the TVA nuclear power program pursuant to certain specific grants of authority (*see* Memorandum of Understanding) including the authority "to hire, remove, assign, reassign, or direct any personnel supplied by outside contractors ... as he may deem necessary or desireable [sic]...." ¶ 2, Exhibit 49, Court File No. 92. The Manager of Nuclear Power certainly had responsibility for the safety of the nuclear program and administering the contract with QTC for review of employee safety complaints pursuant to the broad authority given him. The choices made regarding the QTC contract, its subject matter and performance were within his scope of authority. As Manager of Nuclear Power, he was ultimately responsible for decisions regarding the performance of that contract and was surely the official with ultimate authority to determine the services required of QTC on an "as and when requested" basis.

Whether or how to utilize the "personal services" of QTC under the contract certainly fell within the broad grant of general authority given White to operate the TVA nuclear power program. Within that scope of responsibility, White dealt with the QTC contract and its implications for the nuclear program restart. His actions affecting the QTC contract challenged by QTC in this case include his allegedly making defamatory statements about QTC personally to other federal officials—statements which were also published in the press, and his alleged tortious interference with QTC's existing contractual relationship with the TVA. QTC's claims arise from White's decision to stop requesting its services because QTC's contract performance was not what he as Manager of Nuclear Power desired. Despite the fact that White himself has not offered evidence to explain his decision regarding QTC, or the manner in which it was made, the decision of how best to use a contractor was certainly within the scope of his discretionary authority, outlined previously.

Specifically, QTC alleges that defamatory statements were made to a Congressman and later given by White to the press to the effect that QTC was terminated because it did not measure up to White's own quality standards and QTC's services cost too much. *See* Plaintiff's Response, Court File No. 87, and Exhibits 8 and 9, Court File No. 92. These statements were apparently made by White in response to inquiries regarding why QTC was being phased out by TVA. The Court finds ample evidence in the record to support the conclusion that such statements were made within the scope of White's duties as TVA Manager of Nuclear Power and reflect his personal opinion as to the quality and performance of QTC. *See, e.g., Queen v. Tennessee Valley Authority*, 689 F.2d 80, 86 (6th Cir.1982); *Walters v. Tennessee Valley Authority*, 503 F.Supp. 111, 115 (E.D. Tenn.1980), *aff'd* 698 F.2d 1225 (6th Cir. 1982) (Table, No. 80–5430), *cert. denied*, 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982). Plaintiffs have failed to challenge

the defendants' claim that their actions were discretionary, and may not rely on the allegations of their complaint to create an issue of fact in light of the affidavits offered by the defendants relevant to this issue. These factual circumstances lead the Court to conclude that the challenged actions were in fact discretionary, and therefore satisfy the second prong of the *Westfall* test. For these reasons, the Court finds the standards for absolute official immunity have been satisfied. *See Westfall*, 484 U.S. at 297, 108 S.Ct. at 584, 98 L.Ed.2d at 626. The plaintiffs' state-law tort claims against Steven White will be DISMISSED. Because QTC alleges its injury to be the direct result of the discretionary actions of Mr. White, while acting in his official capacity, and because this Court has found him to be absolutely immune from common law tort liability, there can be no liability as to defendants STEMAR and Stone & Webster.[4] This result is so because "Tennessee law does not impose vicarious liability when the agent is not subject to individual liability." *Queen v. Tennessee Valley Authority*, 508 F.Supp. 532, 535–36 (E.D.Tenn.1980), *citing Walters*, 503 F.Supp. at 116.

### QTC's Constitutional Claim

With regard to QTC's assertion that the defendants' actions also deprived it of its Fifth Amendment right to due process because there was no due process hearing before termination of its services under the TVA contracts, the defendants assert that they are shielded by the protection of qualified immunity. Qualified immunity standards are clearly set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "In *Harlow*, the Supreme Court held that federal officials performing discretionary functions are shielded from liability for civil damages if 'their conduct does not violate clearly established constitutional rights of which a reasonable person would have known.' " *Newhouse v.*

*Probert*, 608 F.Supp. 978, 982 (W.D.Mich. 1985). As previously noted, there is ample documentary evidence supporting the conclusion that the decision to terminate or alter in any way the activity of a contractor working within the TVA nuclear power program was within both the general and specific scope of authority granted the Manager, and discretionary.

The Court must now determine whether the defendants' conduct violated the plaintiff's "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738, 73 L.Ed.2d at 410. In *Harlow*, the Court created an objective test for such determination, directing courts to consider "the objective reasonableness of an official's conduct, as measured by reference to clear established law, …" *Id.* Further, where the issue arises in the context of a summary judgment motion, the resolution of this issue becomes a question of law for the Court. It is for this Court to determine both the applicable law, and whether it was "clearly established" at the time of the defendants' challenged actions. *Id.* See also *Washington v. Starke*, 855 F.2d 346, 348 (6th Cir.1988).

Plaintiff asserted initially only a "property" interest protected by the Fifth Amendment from deprivation absent due process of law. It now seeks to amend its complaint to allege the deprivation of a protected "liberty" interest as well. The Court will consider the validity of both claims under these facts.

Initially, QTC's assertion of injury to a protected "property" interest requires that it show that it had a property interest in continued employment under its contract with TVA. In opposition to QTC's assertion, the defendants rely upon contract terms which describe the parties' agreement as a "personal services" contract, under which QTC agreed to render services to TVA "when and as requested" by TVA.

---

4. Defendant STEMAR is a closely held corporation, the principals of which are Steven White and his wife, that contracted with Stone & Webster Engineering Company to provide consulting services. Defendant Stone & Webster is a large engineering concern that contracted with TVA to provide the services of Steven White, through STEMAR, as a "loaned employee" to TVA's nuclear power program.

*See* Exhibits 11 and 30, Court File No. 92. In order for QTC to have a "property" interest in the TVA contract, it must have "a legitimate claim of entitlement" to performance under it. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 561 (1972). In this case, QTC's property interest in the TVA contract is defined by the language of the contract itself. The Court is hard pressed to find a property interest created by the terms of the instant contract.

■ The nature of a personal services contract is such that the parties' agreement as to the services to be performed defines their obligations under the contract. In this case, contract No. TV–66317A provided that QTC would perform for TVA the specifically described services in ¶ 1.A.(1)–(11) of the contract (Exhibit 30), "when and as requested" by TVA. Clearly, services were requested by TVA and undertaken by QTC, as evidenced by the subsequent amendments to the original contract, and the fact that sums were expended by TVA in payment therefor. *See* Exhibits 31–33, Court File No. 92. However, any "property" interest QTC may have would certainly be limited to only those personal services actually requested by TVA, but not extending to the performance of services not requested. This much QTC admits in its response. *See* Plaintiff's Response at 22, n. 6, Court File No. 87.

■ QTC also (or instead) relies upon an asserted "liberty" interest that it claims was deprived by the defendants' alleged interference with the TVA contract and alleged defamatory statements. QTC asserts that it has a protected "liberty" interest in its reputation, which was injured by the defendants' actions. As QTC has pointed out, the leading case on this point is *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), in which the Supreme Court found:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that the reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

424 U.S. at 701, 96 S.Ct. at 1160, 47 L.Ed.2d at 414. Mere defamation, without a resulting actual injury is insufficient to state a claim under the Fifth Amendment. *Id.* at 702, 96 S.Ct. at 1161.

■ The Supreme Court has considered, under various factual circumstances, what actual injury is necessary when paired with a defamation to create a constitutionally recognized injury. In *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), the Court found that government action labeling three government employees as "subversive" and "unfit for Government service" so severely stigmatized their reputation and future livelihood that their discharge amounted to a "proscription of these employees prohibiting their ever holding a government job." *Paul*, 424 U.S. at 702, 96 S.Ct. at 1161 (quoting *Lovett*, 328 U.S. at 314, 66 S.Ct. at 1078). Likewise, in *Joint Anti–Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817 (1951), the Court held, without a majority in agreement, that merely being designated as "subversive" or "communist" is alone not actionable, but when coupled with the deprivation of employment can state a cognizable claim. "To be deprived not only of present government employment but of future opportunity for it certainly is no small injury when government employment so dominates the field of opportunity." *McGrath*, 341 U.S. at 184–85, 71 S.Ct. at 655–56. Subsequent to *McGrath*, the Court held that a government contractor's employee discharged by the commanding Navy officer was not entitled to a Fifth Amendment due process hearing where the private interest asserted by the employee was the right to a particular employment. In *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), the Court held no liberty interest was implicated when govern-

ment action merely denied the plaintiff "the opportunity to work at one isolated and specific military installation," but did not affect her "chosen trade or profession ... [and she] remained entirely free to obtain employment as a short-order cook or to get any other job,...." *Id.*, 367 U.S. at 895, 81 S.Ct. at 1748, 6 L.Ed.2d at 1236. Clearly, it is the "attendant foreclosure from other employment opportunity" resulting from an injury to one's reputation which gives rise to protections of the Fifth Amendment. *McElroy*, 367 U.S. at 898, 81 S.Ct. at 1750, 6 L.Ed.2d at 1238. *See Roth*, 408 U.S. at 572–74, 92 S.Ct. at 2706–08, 33 L.Ed.2d at 558–59.

 QTC asserts that this case is the "different case" referred to by the *Roth* Court which would present facts establishing a violation of Fifth Amendment protected liberty interest. In distinguishing the facts in *Roth* from facts supporting a liberty interest, the Court found that Roth's treatment by the Board of Regents did not "foreclose his freedom to take advantage of other employment opportunities," where the defamation alleged "did not ... seriously damage his standing and associations in his community." Nor did the published reasons for his not being rehired involve allegations of "dishonesty, or of immorality." *Roth*, 408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558. In contrast, QTC asserts that the allegedly defamatory remarks of the defendants caused an actual injury to its reputation that satisfies the Supreme Court's test for creating an injury compensable under the Fifth Amendment. In support of this claim, QTC has submitted an affidavit purporting to show that QTC was denied specific employment subsequent to and because of the allegedly defamatory remarks of the defendants. *See* Court File No. 90.

The Court has reviewed this affidavit and is not convinced that the factual assertions contained therein establish that QTC was foreclosed from obtaining subsequent employment as a result of the challenged statements. Specifically, ¶¶ 7 and 8 of the affidavit indicate that although QTC was apparently not considered for the potential

contract with Houston Lighting & Power due to "the reputation of their company and their work for TVA," the affidavit concludes by stating in ¶ 8 that no company was hired to perform the work that QTC asserts it was denied. It appears that at most, QTC may have been denied the opportunity of serious consideration for the Houston work; however, since no work was ever performed under that specific, potential contract by any contractor, it is difficult to conclude that QTC was actually denied this employment opportunity. Nevertheless, the Court must determine whether QTC has produced sufficient material evidence of a protected liberty interest to withstand the challenge of the defendants' motion.

 "To establish a liberty interest, an employee must demonstrate that his governmental employer has brought false charges against him that 'might seriously damage his standing and associations in his community,' or that impose a 'stigma or other disability' that forecloses 'freedom to take advantage of other employment opportunities.'" *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th Cir.1984), *cert. dismissed*, 473 U.S. 901, 106 S.Ct. 11, 87 L.Ed.2d 672 (1985). It is clear that the "stigma" resulting from the damage to QTC's reputation must be serious in order to implicate a protected constitutional liberty interest. Just how serious the stigma must be is sometimes thought to be a mystery. *See Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir.1987). In the Seventh Circuit, the standard announced in *Colaizzi* to identify a protected "occupational liberty" interest holds "that to fire a worker to the accompaniment of public charges that make it unlikely that anyone will hire him for a comparable job infringes his liberty of occupation." *Id.* Apparently, under this line of cases the mere threat or likelihood that the dismissal and damage to reputation will adversely affect future employment is sufficient to create a liberty interest.

Other courts have defined the standard a bit more narrowly by requiring that public accusations of "dishonesty", "immorality",

or "moral turpitude" form the basis for dismissal before a protected liberty interest can be asserted in one's reputation. *See Bollow v. Federal Res. Bank of San Francisco,* 650 F.2d 1093, 1101 (9th Cir.), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1981) (citations omitted). In several cases cited by the *Bollow* court, it was held that dismissal based on incompetence, unsatisfactory performance or personnel problems was insufficient to infringe a liberty interest. *Id. See also Loehr v. Ventura County Comm. College Dist.,* 743 F.2d 1310, 1317 (9th Cir.1984); *Hadley v. Du Page County,* 715 F.2d 1238, 1245 (7th Cir.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984); *Robertson v. Rogers,* 679 F.2d 1090, 1091 (4th Cir.1982); *Gray v. Union County v. Inter. Ed. Dist.,* 520 F.2d 803, 806 (9th Cir.1975); *Lake Michigan College Fed. of Teachers v. Lake Michigan Comm. College,* 518 F.2d 1091, 1097 (6th Cir.), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1975); *Abeyta v. Town of Taos,* 499 F.2d 323, 332 (10th Cir.1974); *Schwartz v. Thompson,* 497 F.2d 430, 432 (2d Cir.1974).

In this Circuit, the applicable cases require that the challenged dismissal and resultant "stigma" on a plaintiff's reputation must involve "the voluntary, public dissemination of false information in the course of a decision to terminate ... employment." *Burkhart v. Randles,* 764 F.2d 1196, 1201 (6th Cir.1985). *See also Kendall v. Board of Ed. of Memphis City Sch.,* 627 F.2d 1, 5 (6th Cir.1980). For authority requiring that the allegations forming the basis for dismissal from employment and the resulting "stigma" to one's reputation be challenged as "substantially false" in order to state a due process claim, *see Codd v. Velger,* 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977). As the Supreme Court explained, the due process denied a dismissed and stigmatized employee is the opportunity to refute the charges of improper conduct and clear his or her name. If the truth of the charges is not challenged, then "no hearing would afford a promise of achieving that result...." *Id.*

▮▮ In this case, QTC's claim arising from the alleged deprivation of its "liberty" interest centers on the injury to its business reputation perceived to be the result of statements made by defendant White and defendant BETA's officer, Mr. Wegner, subsequently published by the media. Specifically, it was reported in various newspaper articles (Exhibits 8 and 9, Court File No. 92) that White caused the reduction of QTC's role at the Watts Bar Nuclear plant because QTC "cost too much; was too slow; and didn't meet White's standards of quality." White is further quoted as telling a congressman that QTC was "lazy, slow, and their reports are the worst I have ever read." The wire service also carried the following statement and quote:

> "But White said the process [QTC's investigation of TVA employee concerns] was moving too slow, and TVA was not getting a good return on its money.
>
> . . . .
>
> "My standards are very high," White said. "So it is, perhaps, not unheard of that I might find a contractor who isn't meeting my standards in terms of the work itself."

Mr. Wegner is asserted to have told a Department of Labor investigator that "QTC was a cancer to be dealt with." QTC asserts that these allegedly defamatory statements caused a recognized injury to its professional reputation. QTC asserts that the statements were sufficiently stigmatizing to be compensable as an injury to its constitutionally protected liberty interest. The Court disagrees.

"[A]llegations of improper or inadequate performance do not constitute a deprivation of liberty within the meaning of the fourteenth amendment." *Lake Michigan College Fed. of Teachers,* 518 F.2d at 1097 (citations omitted). Courts interpreting the Supreme Court's holding in *Roth* have held that charges of "incompetence, neglect of duty and malfeasance in office" are insufficient to support a claim of liberty interest deprivation. *Id. See also Adams v. Walker,* 492 F.2d 1003, 1006–09 (7th Cir.1974). The *Roth* Court noted that the type of due process guaranteed to protect one's liberty

interest in his good name and reputation comes in the form of "notice and hearing" regarding the charges giving rise to the termination. *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The *Roth* Court's elaboration on this point is important to the instant case in that the examples offered by the Court involved charges of "dishonesty and immorality." *Id. See also* cases cited herein at 27–29. As noted by the parties, a pre-termination hearing may also be required under *Roth* where the charges resulted in "a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The Court finds that the public statements made by White as justification for phasing out QTC, and of which QTC here complains, are not sufficient to infringe upon a protected liberty interest.

The statements made by White are clearly not of the kind generally considered to stigmatize one's reputation and good name. The statements merely reflected White's opinion of the competence and job performance of QTC and are not actionable under the numerous cases previously cited. *See Loehr,* 743 F.2d at 1317; *Hadley,* 715 F.2d at 1245; *Robertson,* 679 F.2d at 1091; *Gray,* 520 F.2d at 806; *Lake Michigan College Fed.,* 518 F.2d at 1097; *Abeyta,* 499 F.2d at 332; *Schwartz,* 497 F.2d at 432; *Blair v. Board of Regents,* 496 F.2d 322 (6th Cir.1974).

Because the Court finds that the facts of this case do not support the plaintiff's claim that the defendant Steven White's actions deprived it of a protected "liberty" or "property" interest, the Court finds as a matter of law that Steven White is entitled to summary judgment. Therefore, the Court is not required to reach the question of the defendant's entitlement to qualified immunity.

■ However, even if the remarks were legally actionable, the Court believes Steven White is entitled to qualified immunity from liability for his actions. *See Smith v. White,* 666 F.Supp. 1085, 1090–91 (E.D. Tenn.1987).

Under the standard for qualified immunity enunciated in *Harlow* and recently applied in *Anderson v. Creighton,* the question of personal liability for otherwise unlawful official acts revolves around "the objective legal reasonableness" of the challenged actions, "assessed in light of the legal rules that were 'clearly established' at the time it was taken," by the official. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523, 530, citing *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738. *See also Garvie v. Jackson,* 845 F.2d 647, 649 (6th Cir.1988). Under the objective standard, an official is immune from liability for civil damages if his or her actions could be reasonably considered "consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. at 3038, 97 L.Ed.2d at 530. Stated another way, the law existing at the time of the challenged action must "clearly proscribe the actions" of the official in order for the protection of qualified immunity to be denied. *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411, 426 (1985).

> [C]ases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, (citations omitted) but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039, 97 L.Ed.2d at 531.

As noted in this circuit, courts "should focus on whether, at the time defendants acted, the rights asserted were clearly established by decisions of the Supreme Court or the courts of this federal circuit." *Garvie,* 845 F.2d at 649 (citations omitted). *See also Ohio Civil Ser. Empl. Assoc. v. Seiter,* 858 F.2d 1171 (6th Cir.1988). Defendants "have qualified immunity unless plaintiff's 'rights were so clearly estab-

lished when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct.'" *Ramirez v. Webb,* 835 F.2d 1153, 1156 (6th Cir.1987), *quoting Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987). *See also Garvie,* 845 F.2d at 649–50; *Seiter,* 858 F.2d at 1173.

This Court does not believe that QTC's asserted legal rights were sufficiently "clearly established" at the time of the alleged defamation (or now) so that the defendant Steven White should, objectively, have "clearly understood" that his statements violated those rights. Clearly, a substantial portion of the relevant caselaw regarding the defamatory nature of published comments referring to an employee's incompetence, unsatisfactory performance or personnel difficulties holds that such criticisms, even if made publicly, do not amount to a violation of a protected liberty interest. *See Loehr,* 743 F.2d at 1317; *Hadley,* 715 F.2d at 1245; *Robertson,* 679 F.2d at 1091; *Gray,* 520 F.2d at 806; *Lake Michigan College,* 518 F.2d at 1097; *Abeyta,* 499 F.2d at 332; *Schwartz,* 497 F.2d at 432. The Court has found no cases that support the plaintiff's claim that such a criticism infringes a constitutionally protected interest, therefore, the defendant could not have objectively believed his conduct violated a right or interest of QTC's.

The Court, therefore, concludes that QTC's constitutional rights asserted to have been violated by defendant Steven White's conduct were not so clearly established when the alleged defamatory remarks were made that White, objectively, could be said to have clearly understood that his conduct violated those rights. Steven White would, therefore, be entitled to the protection of qualified immunity under the facts of this case. For the reasons previously noted, defendants Stone & Webster and STEMAR cannot be held vicariously liable under these facts and Tennessee law. *See Queen,* 508 F.Supp. at 535–36; *Walters,* 503 F.Supp. at 116.

### QTC's Claim Against Defendant Beta, Inc.

QTC asserts that a statement made by the principal of defendant Beta, Inc., William Wegner, to a Department of Labor investigator and subsequently published in the media tortiously disparaged the trade and business reputation of QTC. The statement cited by QTC was given by Wegner during a May 30, 1986 interview conducted by a Department of Labor ("DOL") investigator in which Wegner allegedly stated that "QTC was a cancer to be dealt with." *See* Plaintiff's Answers to Defendants' First Set of Interrogatories, Question and Answer 1, Court File No. 11. In addition, QTC asserts that defendant Beta, Inc., through William Wegner, interfered with its ongoing contractual relationship with TVA by specifically insisting that TVA terminate its relationship with QTC during contract negotiations between Beta, Inc. and TVA. *See Id.,* Question and Answer 4.

 In their motion for summary judgment, defendants assert that the challenged statement given by Wegner is absolutely privileged as a result of the circumstances under which it was given by Wegner. The defendants assert that because the Wegner statement was given in the context of an official investigation conducted by a federal agency, *see* 42 U.S.C. § 5851, investigating the employment discrimination claims of certain previously dismissed TVA employees, the statement is not actionable. The Court agrees.

Wegner made the challenged statement while being interviewed by DOL investigators. The investigation was conducted pursuant to federal statute and the relevant federal regulations enacted thereunder. *See* 42 U.S.C. § 5851(b)(2)(A) and 29 C.F.R. 24.4(b) and (c). The regulation cited in fact provides for the confidentiality of information obtained. 29 C.F.R. 24.4(c). In this instance, there is no evidence to indicate that the statement given was intended for public dissemination. *See* Wegner Deposition at 125–26. The allegedly defamatory statement was taken down on an official "Employee Personal Interview Statement"

form, in the ordinary course of a fact-finding interview for use by the DOL in its labor complaint investigation. The inquiry was instigated by complaints filed by former TVA employees over their dismissal from TVA employment. *See* Marquand Affidavit, Court File No. 32. It does not appear to the Court that the statement was given in response to questions regarding QTC, but merely as "background information" or a description of the complaints received about TVA conditions in the course of Wegner's employment through Beta, Inc. with TVA. *See* Wegner Deposition at 138. Wegner in fact stated that he was merely repeating what he had been told by one of three possible other persons associated with TVA. *Id.* at 134.

In order for QTC's claim that its liberty interest was deprived by Wegner's remarks to be actionable, QTC must show that the charges were made public by the employer. *See Burkhart v. Randles,* 764 F.2d 1196, 1201 (6th Cir.1985); *Bollow,* 650 F.2d at 1101 (citations omitted). The Court finds that this element has not been satisfied by QTC. Wegner's deposition testimony clearly establishes that the statement was made under circumstances that led him to rely on its confidentiality (Wegner Deposition at 125) and that media access to the statement originated outside the TVA nuclear power program. Specifically, Wegner asserts that his first notice that the statement was recorded in writing and public came when a member of Congress "was waiving it in the air at a hearing." *See* Wagner Deposition at 125. The Court is unaware of any evidence offered by QTC to rebut this assertion by Wegner that he did not publicly disseminate the challenged remark.

Additionally, as to the liability of Beta, Inc., the Court finds that since the challenged statements of Wegner are not actionable under QTC's constitutional theory, Beta, Inc. cannot be liable. Because all the acts performed and statements made that form the basis of QTC's claims were done by Wegner, and the Court has determined that he cannot be liable for damages, Beta, Inc. cannot therefore be held vicariously liable. *See Queen v. Tennessee Valley Authority,* 508 F.Supp. 532, 535–36 (E.D.Tenn.1980); *Walters v. Tennessee Valley Authority,* 503 F.Supp. 111, 116 (E.D.Tenn.1980), *aff'd,* 698 F.2d 1225 (6th Cir.1982) (Table, No. 80–5430), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982).

An appropriate order will enter.

## ORDER

For the reasons stated in the accompanying memorandum opinion filed herewith and passed this day to the Clerk for filing, the motion of the defendants Stone & Webster Engineering Company, Inc., STEMAR Corporation, Beta, Inc., and Steven A. White for summary judgment (Court File No. 31) as to the claims of the plaintiff Quality Technology Company is GRANTED. This civil action is, therefore, DISMISSED.

SO ORDERED.

## MEMORANDUM

### ON MOTION TO ALTER OR AMEND

Plaintiff, Quality Technology Company (hereinafter "QTC"), has filed a motion to alter or amend the judgment pursuant to Rule 59(e), Fed.R.Civ.P. (Court File No. 177), seeking reconsideration of this Court's previous order (Court File No. 176) granting the defendants' motion for summary judgment and dismissing this suit. *See also* Court's Memorandum, Court File No. 175. The defendants have responded in opposition to the motion (Court File No. 193). QTC asserts that the Court's memorandum contains various legal errors in its analysis and disposition of the issues raised in this case. The Court will now consider the plaintiff's arguments.

### *Absolute Official Immunity*

QTC once again argues that the Court incorrectly ignored Steven White's "employment status" in applying the "functional analysis" clearly mandated by the Supreme Court in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). QTC ar-

gues that the unique contractual arrangement between the Tennessee Valley Authority ("TVA"), Stone & Webster Engineering Company ("SWEC"), STEMAR and White is relevant to whether these defendants are entitled to the protection of absolute official immunity. Specifically, QTC argues that White was not "lawfully entrusted" with governmental authority, the very exercise of which is the basis for the plaintiff's complaint. QTC relies upon the Comptroller General's opinion offered in response to an inquiry by a member of Congress, which determined that the contract between the defendants providing for White's services "constitutes the improper use of a personal services contract and represents a circumvention of the statutory ceiling on salary payments to TVA employees." *See* Court File No. 185, Appendix B, "Untitled" Opinion ¶ 86 FPBR 1087 (June 2, 1986) at X1–492.[1]

This Court remains convinced that under the proper legal analysis, the "functional" approach to immunity questions focuses on the "particular official functions" performed by the defendant—not on the individual's "particular office[ ]" or "the status of the defendant." *Westfall*, 484 U.S. at 296 n. 3, 108 S.Ct. at 583 n. 3, 98 L.Ed.2d at 625 n. 3; *Briscoe v. LaHue*, 460 U.S. 325, 342, 103 S.Ct. 1108, 1119, 75 L.Ed.2d 96 (1983). As quoted in *Cleavinger v. Saxner*, " '[O]ur cases clearly indicate that immunity analysis rests on functional categories, not on the status of the defendant.' Absolute immunity flows not from rank or title or 'location within the Government,' but from the nature of the responsibilities of the individual official." 474 U.S. 193, 201, 106 S.Ct. 496, 500, 88 L.Ed.2d 507 (1985) (citations omitted).

▉ QTC challenges the status of White's contractual relationship with TVA and the other defendants as "illegal," arguing that because the agreement was viewed by at least one entity as constituting an "improper use of a personal services contract," White was not "lawfully entrusted" with the requisite discretionary authority necessary to assert the protection of official immunity. For the reasons that follow, the Court disagrees. Clearly, the mandated "functional analysis" determinative of an official's entitlement to immunity does not depend on the actor's employment status. *See* Memorandum, Court File No. 175 at 12–14. Furthermore, it would appear that White was in fact "lawfully entrusted" with the authority to perform the discretionary functions relating to QTC and its personal services contract and supplements with TVA at all times relevant to the actions challenged by the plaintiff. Even assuming, without conceding, that the contractual agreement between TVA and White was somehow improper, there is ample evidence that White performed his responsibilities pursuant to the "Memorandum of Understanding" executed by the parties, and that the parties recognized its terms as the basis for his relationship to TVA and its nuclear power program. It would appear from the record that, despite any claim that the contract between White and TVA should be void, White continued to perform his discretionary duties under the contract, and shared with TVA "the same interest in getting the Government's work done." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 505, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442, 453 (1988).[2] In any event, as far as this Court is aware,

---

1. QTC argues, in conjunction with its reliance on the Comptroller General's report, that "there is no question that the contractual arrangements insisted on by the defendants were directly prohibited by the provisions of 18 U.S.C. § 208(a), the federal conflict of interest statute, ...." Plaintiff's Brief in Support, Court File No. 187 at 15. The Court notes, however, that the Comptroller General's opinion makes no reference to 18 U.S.C. § 208(a). In fact, the inquiry that resulted in the Comptroller General's opinion arose as an interpretation of TVA's statutory salary limitation, 16 U.S.C. § 831h.

2. The analysis of "discretionary function" by the Court in *Boyle*, at 511, 108 S.Ct. at 2517, 101 L.Ed.2d at 457, would similarly support this Court's conclusion that White performed a "discretionary function" on behalf of TVA. Certainly White was called upon to exercise considerable judgment in the management and operation of the TVA nuclear program, balancing many technical, managerial and employment considerations, very similar to those described and relied upon in *Boyle*.

the record contains no legally binding determination that the contract arrangements between TVA and the defendants were improper or illegal under 18 U.S.C. § 208(a). The Court, therefore, finds that there exists no genuine issue of material fact regarding the validity of the TVA contractual arrangements with White as it may arguably relate to White's entitlement to the protection of official immunity and the "functional" analysis thereunder.

As for the Court's holding that White was also entitled to the protection of qualified immunity from liability for the asserted constitutional tort claim, QTC argues that the Court ignored the fact that QTC was prevented by the defendants from performing services previously requested at the time QTC responsibilities were scaled back. Initially, it is important to reiterate that QTC had no recognized property interest in continued employment under a personal services contract that called for QTC's performance "when and as requested" by TVA. *See* Memorandum, Court File No. 175 at 26–27. As the defendants point out in response to this argument, the record indicates that QTC was paid the agreed upon contract price for its services under Contract No. TV–66317A and the four supplements negotiated thereto. It appears that this contract expired when the parties failed to reach agreement on a fifth supplement. However, QTC entered into another contract with the TVA to assist the agency in setting up an employee response team ("ERT") program to investigate employee safety complaints. That second contract was known as TV–68705A and, under similar terms as TV–66317A, was a personal services contract for services "when and as requested." *See* Deposition Exhibit 11, Court File No. 92, Appendix F.

QTC likewise acquired no recognized property interest in continued employment pursuant to the terms of this second contract. QTC has failed to come forward with "significant probative evidence" to support its claim of injury to a recognized property or liberty interest arising under the parties relationship defined by the second contract, TV–68705A. *See Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). QTC's argument that the executed contract and subsequent summary letter (Exhibit 11, Court File No. 102) are sufficient to withstand the defendants' motion and the appropriate legal standard is without merit (*see* Court File No. 187, QTC's Brief in Support at 7). The Court previously determined (Memorandum, Court File No. 175 at 27–35) that the alleged damage to QTC's reputation resulting from the defendants' remarks critical of its performance did not constitute an injury to QTC's protected "liberty interest" because the Court found that the remarks were not legally actionable. The Court, on reconsideration, remains convinced of the correctness of that determination for the reasons previously stated.

QTC also argues that the Court failed to acknowledge that certain "reasonable inferences" could be drawn from facts alleged by QTC in support of its claim of a conspiracy. QTC has asserted that the alleged conspiracy was formed by the defendants prior to the beginning of their contract arrangements and service for TVA for the purpose of "obtaining control of TVA's nuclear program." *See* QTC's Brief in Support at 9–13. QTC argues that improper motives can be gleened from the evidence, which, when considered in the light provided by QTC's argument of the facts, challenges the defendants' entitlement to immunity. The Court is convinced that QTC's argument on this issue is too pale to withstand summary judgment. Clearly, the actor's motive in performing a discretionary governmental function will not alone bar the application of official immunity in appropriate cases. *See Barr v. Matteo*, 360 U.S. at 575, 79 S.Ct. at 1341; *Palermo v. Rorex*, 806 F.2d 1266, 1272 (5th Cir.1987). Clearly, the specific actions of the defendant on which QTC relies in support of its constitutional claims occurred subsequent to the time the defendants began their contract work for TVA.[3] Any

---

3. The record establishes that QTC's participation in the ERT program was reduced after White took over TVA's nuclear power program.

motives, proper or improper, that some or all of these defendants may have had for seeking out a business relationship with TVA are irrelevant to QTC's claims in this suit and the defendants' entitlement to immunity where the standards for the proper application of official or qualified immunity are otherwise satisfied.

For the reasons herein stated, together with those set forth in the Court's previous memorandum, Court File No. 175, plaintiff's motion to alter or amend the judgment granting the defendants' motion for summary judgment will be DENIED. An appropriate order will enter.